UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
YESSENIA PEREZ,

               Plaintiff,

     - against -

COMMISSIONER OF SOCIAL SECUIRTY,

               Defendant.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-6232 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

     Plaintiff Yessenia Perez brings this action against the Commissioner of the Social Security Administration ("the Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review of defendant's determination that plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act ("SSA") or Supplemental Security Income under Title XVI of the SSA. Plaintiff and defendant have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Def.'s Mot. (Doc. No. 17); Pl.'s Mot. (Doc. No. 19).) For the reasons set forth below, defendant's motion is DENIED, plaintiff's motion is GRANTED, and the matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

### PROCEDURAL HISTORY

     Plaintiff filed claims for disability insurance benefits under Title II of the SSA and Supplemental Security Income under Title XVI of the SSA on December 18, 2012, alleging an onset of disability on November 7, 2012. (Tr. (Doc. No. 23) 385–92, 455, 473.) After plaintiff's application was denied at the initial level, she appeared for a hearing before Administrative Law Judge ("ALJ") Marilyn Hoppenfeld on May 16, 2014. (Tr. 81–156.) In a decision dated April 20, 2015, ALJ Hoppenfeld found plaintiff not disabled. (Tr. 206–23.) The Appeals Council

subsequently remanded the case for a new hearing with a different judge pursuant to the class

action settlement in *Padro v. Astrue*, No. 11-CV-1788 (CBA) (RLM), 2013 WL 1192824, at *1

(E.D.N.Y. Oct. 18, 2013). (Tr. 229–33.)  A second hearing was held before ALJ Jay L. Cohen

on March 31, 2016. (Tr. 48–80.)  ALJ Cohen issued a decision, dated May 4, 2016, finding

plaintiff not disabled. (Tr. 18–47.)  The Appeals Council denied plaintiff's request for review on

August 29, 2017, making ALJ Cohen's decision the final determination of the Commissioner.

(Tr. 1–7.)

For purposes of this decision, the Court will refer only to the evidence, testimony, and

decision in the second hearing.

## BACKGROUND[1]

### I.    Plaintiff's Disability Claim

Plaintiff Yessenia Perez was born on September 8, 1973. (Tr. 186, 195.)  She completed

the eleventh grade, and she is able to read, write, and communicate in English. (Tr. 52–54, 91–

92, 454, 456.)

Plaintiff's past relevant work was as a sales/stock person, a cashier, and a maintenance

worker for a school. (Tr. 52–55, 94–99, 455, 463, 495, 513.)  Plaintiff's most recent

employment was as a cashier and stock person in a clothing store, a position she held until

October 29, 2012, when the business was closed due to Hurricane Sandy. (Tr. 52–55, 455, 463.)

On November 4, 2012, plaintiff received emergency room treatment for an exacerbation

of asthma. (Tr. 536–51.)  A few days later, on November 7, 2012, the alleged date of onset,

plaintiff was transported to Queens Hospital Center after she collapsed and lost consciousness.

(Tr. 27, 553.)  A CT-scan of plaintiff's brain and an angiogram revealed that she suffered from a

---

[1] The Court adopts the parties' joint stipulation, (Doc. No. 27), as the facts in this case. The following facts are
drawn from that stipulation, as well as the administrative transcript. (Tr. (Doc. No. 23).)

grade 3 subarachnoid hemorrhage of a ruptured anterior communicating artery (ACA) aneurysm[2]

causing hydrocephalus.  (Tr. 553, 605–741, 745–878, 879–89, 908–1946, 1989–94, 1998–2004,

2008, 2101–02, 2112–14.)  The diagnosis was subarachnoid hemorrhage, cerebral vasospasm.

(Tr. 27.)  Plaintiff was transferred from Queens Hospital Center to Mt. Sinai Hospital ("Mt.

Sinai") via ambulance where she underwent two brain surgeries.  (Tr. 27.)  Neurosurgeon Joshua

Bederson, M.D., performed an emergency craniotomy, clipping the aneurysm and placing a

ventriculoperitoneal shunt from plaintiff's brain to her abdomen to prevent the buildup of fluid.

(Tr. 553–56, 590–92, 597–98, 601, 1989–95, 2115–16.)  Plaintiff remained hospitalized at Mt.

Sinai for approximately 19 days, until November 26, 2012.  (Tr. 553, 605–741, 745–878, 879–

89, 908–1946, 1989–1994, 1998–2004, 2008, 2101–02, 2112–14.)

Plaintiff filed her claim on December 18, 2012, alleging disability on the basis of brain

aneurysm, high blood pressure, and asthma.  (Tr. 385–92, 455, 473.)  At a hearing held in 2016,

ALJ Cohen found that plaintiff had "the following severe impairments:  chronic headaches,

obesity, asthma, and fibroid tumors with anemia."  (Tr. 24.)

Because this Court remands on the issue of chronic headaches resulting from plaintiff's

brain aneurysm, the Court will address only the medical evidence and testimony which are

relevant to that portion of the claim and decision.

## II.    The Medical Evidence

From the date of her brain aneurysm through the date of the denial of disability benefits,

plaintiff was treated or examined by several specialists.  Plaintiff's craniotomy and shunt

placement procedures were performed by Dr. Bederson, who she continued to see through

---

[2] An aneurysm is "an abnormal bulge or ballooning in the wall of a blood vessel. An aneurysm can burst (rupture), causing internal bleeding and often leading to death."  MAYOCLINIC, https://www.mayoclinic.org/diseases-conditions/aneurysms/symptoms-causes/syc-20354633 (last visited Dec. 10, 2019).

outpatient care. (Tr. 59.) Plaintiff was also treated by neurologist Rafael Yakutilov, M.D., who she first saw in 2013, and who she continued to see regularly until at least March 2016. (Tr. 2053, 2300.) She was also evaluated by neurosurgeon J. Mocco, M.D., who performed a cerebral angiogram on October 20, 2015. (Tr. 2173–76, 2283–84.) Plaintiff had one consultative examination with neurologist Joseph Yellin, M.D., though she saw him on November 16, 2016, after the ALJ's decision. (Tr. 183–85.)

Robert Lancer, Ph.D., performed a psychiatric consultative examination on plaintiff on February 26, 2013. (Tr. 900.)

Plaintiff's primary care doctor, Mounir Tawadrous, M.D., examined her as part of her ordinary care. (Tr. 1975.) At the request of the Commissioner, plaintiff was also seen by internist John Joseph, M.D., in February 2013. (Tr. 891–94.) Plaintiff was treated by internist Sahira Ramirez Agramonte, M.D., at various points in 2015 and 2016. (Tr. 2118–30, 2152–57.)

Finally, a medical expert, Steven S. Goldstein, M.D., offered testimony at the 2016 hearing. (Tr. 66–75.)

The findings and observations of these medical professionals are summarized below.

### A. Dr. Joshua Bederson

As referenced previously, Dr. Bederson was the neurosurgeon who performed plaintiff's emergency surgery on November 7, 2012, and who treated her throughout her stay at Mt. Sinai. Following the surgery, plaintiff remained neurologically stable and intact, though she experienced headaches. (Tr. 554–55, 883–89.)

After her discharge, plaintiff had a follow-up appointment with Dr. Bederson on December 5, 2012. (Tr. 1995.) Dr. Bederson found plaintiff to be generally stable but noted that she continued to suffer from headaches and suggested that she see him again in three months.

4

(*Id.*)  Dr. Bederson also requested that plaintiff receive medical transportation and in-home services in light of transportation problems in her area caused by Hurricane Sandy.  (Tr. 2009.)

Plaintiff returned to Dr. Bederson on May 13, 2013, complaining of forgetfulness that prevented her from working, intermittent headaches throughout the day, and abdominal pain that worsened with ambulation.  (Tr. 1996.)  Dr. Bederson opined that the headaches were the result of "post-aneurysmal syndrome," which would also "fit" with memory loss.  (*Id.*)  He noted that she experienced some memory problems and became confused when following directions.  (Tr. 29.)

While plaintiff's treatment following discharge was primarily handled by neurologist Rafael Yakutilov, M.D., she was referred back to Dr. Bederson in 2015 by Dr. Yakutilov, who suggested that plaintiff ask Dr. Bederson whether her abdominal pain might be caused by the shunt.  (Tr. 2162.)  In June of 2015, Dr. Bederson re-examined plaintiff, finding that the shunt was in a good position, but noting that plaintiff complained of chronic headaches, among other things.  (Tr. 2169–70.)  Dr. Bederson referred plaintiff to Dr. J. Mocco of Mt. Sinai's Cerebrovascular Center for an acute vessel catheter angiogram.  (Tr. 2169.)

**B.  Dr. Rafael Yakutilov**

Dr. Yakutilov examined plaintiff ten times over a two-year period, between November 5, 2013, and November 12, 2015.  (Tr. 2053, 2068–72, 2160–61, 2164–68, 2243–45, 2295–99, 2300.)  When Dr. Yakutilov first saw plaintiff on November 5, 2013, she complained of abdominal pain near the shunt, almost daily headaches, skull pain, numbness, insomnia, anxiety, and irritability.  (Tr. 2053.)  The doctor reviewed a CT-scan, taken in April 2013, and found signs of encephalomalacia.  (*Id.*)  Dr. Yakutilov noted that plaintiff was taking Motrin and Percocet for her pain, and Benadryl daily for insomnia.  (Tr. 2053–54.)  He noted that plaintiff

5

might have a problem with overuse of medication, as well as underlying obstructive sleep apnea. (Tr. at 2054.)  Dr. Yakutilov advised plaintiff to stop using Motrin and to continue taking Topamax (an anti-migraine medication).  (*Id*.)  He suggested a trial of Tylenol No. 3 (Tylenol with codeine) when necessary.  (*Id*.)  Dr. Yakutilov also prescribed Nuedexta, an anti-spasm medication for "emotional lability," (*id*.), which is characterized by "pathological laughing and crying with an underlying mood disorder."[3]  He recommended an abdominal CT-scan, as well. (*Id*.)

When plaintiff saw Dr. Yakutilov in February and March of 2014, he noted that the results of an EEG were abnormal, stating that the EEG showed "sharp wave activity" in the "right temporal and central areas" and questionable seizure activity.  (Tr. 2056, 2069, 2071–72, 2160, 2164–65, 2166, 2168.)  Plaintiff told Dr. Yakutilov that she experienced shivering episodes approximately three times per week.  (Tr. 2056.)  Dr. Yakutilov again advised plaintiff not to take Motrin and to continue taking Topamax, as this may help with her "potential underlying seizures."  (Tr. 2056.)  Dr. Yakutilov also prescribed plaintiff Keppra, a seizure medication which her primary care doctor, Dr. Tawadrous, had previously prescribed.  (Tr. 31, 2071.)

On March 31, 2014, Dr. Yakutilov completed a Headache Impairment Questionnaire which noted that plaintiff continued to suffer from chronic, intense, daily headaches and that medication could not completely relieve the pain without unacceptable side effects.  (Tr. 31–32, 2060–65.)  He stated that the headaches were severe enough to interfere with attention and concentration, and that plaintiff would likely be absent from work more than three times per month.  (Tr. 2063–64.)  Dr. Yakutilov also noted that plaintiff was unable to tolerate even low

---

[3] *See Diagnosis and Management of Pathological Laughter and Crying,* MAYOCLINC, https://www.mayoclinicproceedings.org/article/S0025-6196(11)61255-X/fulltext (last visited Dec. 10, 2019).

work stress, and that she should avoid wetness, noise, temperature extremes, heights, pushing, or pulling. (Tr. 2064.)

In May 2014, Dr. Yakutilov suggested that plaintiff undergo a trial of Valium. (Tr. 2165.)

At a visit with Dr. Yakutilov in August 2015, plaintiff complained of ongoing headaches, light headedness, and dizzy spells. (Tr. 2244.) Dr. Yakutilov noted the possibility that the shunt was not working properly and that she was "over-shunted." (Tr. 2149.) He referred plaintiff back to Dr. Bederson.

On February 1, 2016, Dr. Yakutilov diagnosed plaintiff with migraine headaches. (Tr. 2296.) He also wrote a letter, dated March 28, 2016, stating that he had been treating plaintiff regularly since November 2013 for chronic headaches, history of ruptured cerebral aneurysm, and seizures. (Tr. 2300.) He did not classify the headaches in this letter as migraine headaches. (Tr. 2300.) In the letter, he affirmed that the limitations identified in the March 2014 headache questionnaire remained accurate, and that plaintiff would likely be absent from work more than three times each month due to her impairments. (*Id.*)

### C. Dr. J. Mocco

Dr. J. Mocco performed an angiogram on November 4, 2015, at the request of Dr. Bederson. (Tr. 2174.) The angiogram revealed a right ventricular arterial filling with reflux. (Tr. 2176.) In his post-operative diagnosis, Dr. Mocco noted that a "residual aneurysm" was identified. (Tr. 2178.) In January 2016, Dr. Mocco issued a narrative report to Dr. Bederson in which he stated that plaintiff had a "very small residual neck to the aneurysm," which he thought warranted further follow-up although it did not pose an immediate risk of rupture. (Tr. 2283–

84.) Dr. Mocco noted that plaintiff might require further assessment of the aneurysm. (Tr. 2283.)

### D. Dr. Mounir Tawadrous

Mounir Tawadrous, M.D., an internist, treated plaintiff as her primary care doctor during the relevant time period. (Tr. 30.) On February 11, 2013, Dr. Tawadrous saw plaintiff and noted that she complained of abdominal pain and headaches. (Tr. 1975.) He diagnosed her with ACA ruptured aneurysm and seizure disorder, for which Keppra had been prescribed. (*Id.*)

On June 29, 2013, Dr. Tawadrous saw plaintiff for complaints of intermittent headaches and anxiety, among other things. (Tr. 1962.) He noted that she had experienced a bronchial asthma attack requiring a visit to the emergency room since the last visit. (*Id.*)

On September 12, 2013, Dr. Tawadrous completed a Multiple Impairment Questionnaire, diagnosing plaintiff with brain aneurysm, bronchial asthma, subarachnoid hemorrhage, ruptured anterior cerebral artery, recurrent headaches, and lapse of memory. (Tr. 2045–52.) He noted that she experienced frequent headaches and episodes of dizziness "probably" due to brain aneurysm. (Tr. 2046.) Dr. Tawadrous stated that she could not work a full-time job requiring activity on a sustained basis, that the severity of her symptoms would periodically interfere with attention and concentration, and that she was not able to tolerate even "low stress." (Tr. 2048–49.)

In May 2014, Dr. Tawadrous completed another impairment questionnaire, noting that plaintiff's diagnoses were bronchial asthma, obesity, and recurrent, right-sided headaches post ruptured brain aneurysm. (Tr. 2090–91.) He stated that prolonged standing and walking aggravated plaintiff's headaches, and that she could rarely lift or carry up to five pounds; had significant limitations with reaching, handling, or fingering; and could never/rarely use her arms

8

or hand to grip, turn, manipulate, or reach. (Tr. 2090, 2092–93.) Dr. Tawadrous stated that if she were placed in a competitive work environment, her symptoms were likely to increase, and that she would occasionally to frequently experience pain, fatigue, or other symptoms severe enough to interfere with attention and concentration. (Tr. 2093.) He expected that plaintiff would require unscheduled breaks to rest during a workday and stated that she would be absent more than three times per month. (Tr. 2093–94.) Dr. Tawadrous noted that stress and anxiety contributed to the severity of her symptoms. (Tr. 2094.)

### E. Dr. John Joseph

At the request of the Commissioner, internist John Joseph, M.D., performed a one-time consultative examination on February 26, 2013. (Tr. 891–94.) Plaintiff complained of abdominal pain and daily headaches, among other things. (Tr. 891.) Dr. Joseph noted normal findings with the exception of a scar at the right frontal skull area where the shunt palpated below the scar, and he noted that the area was very tender. (Tr. 891–94.) He diagnosed plaintiff with history of aneurysm with shunt, hypertension, and asthma. (Tr. 894.) Dr. Joseph advised plaintiff to avoid dust, smoke, and other respiratory irritants due to her asthma, and stated that she should avoid driving or operating machinery due to her seizure medication. (Tr. 894.)

### F. Dr. Robert Lancer

On February 26, 2013, Robert Lancer, Ph.D., performed a psychiatric consultative examination. (Tr. 900.) Dr. Lancer's report notes that plaintiff claimed difficulty falling asleep, a loss of appetite, and weight loss. (Tr. 898.) Although Dr. Lancer noted that plaintiff reported feeling "stressed out," he also stated that anxiety-related symptomology was denied. (Tr. 898.) Dr. Lancer found that plaintiff's memory, attention, and concentration were intact, but that she only had fair insight and judgment. (Tr. 898–99.) He concluded that plaintiff did not have any

9

psychiatric problem that significantly interfered with her ability to function on a daily basis.  (Tr. 900.)

### G.  Dr. Sahira Ramirez Agramonte

On June 18, 2015, internist Sahira Ramirez Agramonte, M.D., performed a new patient examination on plaintiff.  (Tr. 2118–27.)  Plaintiff's cranial nerves were intact, and she displayed normal strength, sensation, and reflexes throughout.  (Tr. 2121.)  Dr. Ramirez Agramonte performed a depression screening which was positive.  (*Id.*)  The doctor diagnosed plaintiff with asthma exacerbation, for which she administered a nebulizer treatment, and she counseled plaintiff on anxiety.  (Tr. 2122, 2124.)

Dr. Ramirez Agramonte saw plaintiff again on June 29, 2015, and diagnosed her with anemia, among other things.  (Tr. 2128–30.)  On August 20, 2015, Dr. Ramirez Agramonte cleared plaintiff for a cerebral angiogram.  (Tr. 2131–36.)  On September 14, 2015, plaintiff told Dr. Ramirez Agramonte that she suffered from daily, chronic headaches, which measured an eight out of ten in intensity at the worst, and that she needed to rest when she was having a headache.  (Tr. 2182.)  Plaintiff also complained that she felt dizzy when standing for long periods and that she was unable to perform heavy lifting due to pressure she felt in her head. (*Id.*)  Dr. Ramirez Agramonte completed a headache questionnaire for plaintiff's disability applications, in which she stated that plaintiff's chronic daily headaches caused pain that would "frequently" interfere with her attention and concentration, that plaintiff could not tolerate low stress, that she would not be able to perform basic work activities when she had a headache, and that she would likely be absent from work more than three times each month.  (Tr. 2152–57, 2183.)  The doctor also stated that plaintiff would need to avoid noise, dust, pushing, pulling, and bending.  (Tr. 2156.)

10

On October 15, 2015, Dr. Ramirez Agramonte's associate cleared plaintiff for another cerebral angiogram. (Tr. 2195.) An October 20, 2015, cerebral angiogram showed no signs of vascular pathophysiology or recurrence, or residual, or new intracranial aneurysm. (Tr. 2173–76.)

### III.    Hearing Testimony

#### A. Plaintiff

At the March 2016 hearing, plaintiff testified that she lived in an apartment with her 18-year-old son and a friend. (Tr. 52.) She also stated that the last grade that she completed in school was the eleventh grade, and that she last worked in 2012 as a stock person and cashier at a retail store, where she would lift boxes ranging from 30 to 50 pounds. (Tr. 52–53.) She worked there for two years. (Tr. 53.) Previously, from approximately 2001 to 2009, plaintiff worked in a general merchandise store as a cashier and in merchandise stocking where she lifted 30–60 pounds. (Tr. 53–54.) She also worked as a maintenance worker in a school where she lifted over 30 pounds. (Tr. 54, 56.)

Plaintiff explained that she does not work because she suffers from daily headaches which are aggravated when she lifts anything heavy. (Tr. 57.) She testified that she could lift a half gallon, but not a gallon, of milk. (*Id.*) Plaintiff stated that when she experiences a headache, it lasts from one to two hours, the right side of her head throbs, and she is sensitive to noise and light, all of which makes her head painful to touch and requires her to lie down. (Tr. 64–65.) She testified that she was prescribed Tylenol with Codeine for headaches, and that the medicine relieves the symptoms after approximately one hour. (Tr. 65.) Plaintiff also stated that she had never received mental health treatment, but that her neurologist prescribed Valium for anxiety. (Tr. 64–65.)

11

### B. Dr. Steven Goldstein

Steven Goldstein, M.D., testified as a medical expert. (Tr. at 66–75.)[4] Dr. Goldstein testified that without objective evidence that plaintiff's headaches were "intractable," plaintiff's mere testimony was insufficient to demonstrate that she had an impairment that met or equaled the criteria of a listed impairment. (Tr. at 67–68, 73–74.) He stated that he could not conclude that the headaches were intractable based on plaintiff's testimony that she had to lie down in a dark room for an hour when the headaches occurred. (Tr. 74.) Dr. Goldstein explained that there was no medical evidence in the record, such as an "evaluation of memory" or "corroborating evidence on physical examination or emergency room visits," demonstrating that plaintiff's headaches were intractable and that they affected her memory or ability to concentrate. (Tr. 70–71, 74.) Dr. Goldstein noted that there was a diagnosis of medication overuse, and that this appeared to be "the most likely cause" of her headaches. (Tr. 71.) Dr. Goldstein also acknowledged that at one point, Dr. Yakutilov diagnosed plaintiff with migraine headaches, but said that Dr. Yakutilov's "latest diagnoses" were that plaintiff suffered from "chronic daily headaches," rather than migraines, and that "medication relieves [the] headache." (Tr. 74–75.)

### C. Vocational Expert Dale Elizabeth Pasculli

Vocational expert Dale Elizabeth Pasculli also testified at the hearing. Pasculli classified plaintiff's past work as unskilled to semi-skilled, and light to medium in exertion. (Tr. 76, 79–80.) The ALJ asked the vocational expert whether work existed in significant numbers in the national economy for an individual of plaintiff's age, education, work experience, and residual functional capacity. (Tr. 77.) The ALJ posed this question as a hypothetical, stating that Pasculli should assume that the individual in question could perform sedentary work, entailing lifting or

---

[4] The record does not indicate whether Dr. Goldstein has any particular area of specialty.

carrying, pushing or pulling ten pounds occasionally, sitting for six hours, and standing or walking a combination of two hours, in an eight-hour work day.  (*Id.*)  He also stated that the individual would be limited to occasional squatting, crawling, stooping, kneeling, crouching, or balancing; occasional climbing of stairs and ramps; and that the individual could never climb ladders or scaffolds, or be exposed to any dust, fumes, or pulmonary irritants.  (*Id.*)  As part of this hypothetical, the ALJ did not ask Pasculli to assume that the hypothetical person would be unable to tolerate stress and need to avoid noise and bright lights, nor that the person would have impaired attention and concentration.  (Tr. 76.)

In response, Pasculli stated that that the hypothetical individual could not perform plaintiff's past relevant work, but could perform the following types of work:  (1) sedentary semi-skilled work as an assembler of small products (DOT Code No. 2374.367-038),[5] with 70,000 positions existing in the national economy; (2) sedentary, unskilled work as an addresser (DOT Code No. 209.587-010), with 10,000 positions; and (3) sedentary, semi-skilled work as a telephone solicitor (DOT Code No.299.357-14), with 234,000 positions.  (Tr. 76, 77.)  Pasculli noted that in these jobs, most employers would not allow more than one absence per month and would not allow a worker to lie down in a quiet room for one hour per day.  (Tr. 78.)

## STANDARD OF REIVEW

### I.    Review of a Denial of Social Security Benefits

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review.  *See* 42 U.S.C. §§ 405(g), § 1383(c)(3).  However, a court does not determine *de novo* whether the claimant is disabled.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, a court's review under 42 U.S.C. § 405(g) of a final decision by the

---

[5] DOT numbers refer to the occupation code in the U.S. Department of Labor's *Dictionary of Occupational Titles.* *See* https://www.oalj.dol.gov/LIBDOT.HTM (last visited Nov. 26, 2019).

Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." (quoting 42 U.S.C. § 405(g)) (citations omitted)). The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991) (citations omitted). The "substantial evidence" test applies only to factual determinations; the Commissioner's legal conclusions and compliance with statutory or regulatory procedures are not afforded the same deference. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the

14

factual findings of the ALJ." *Id.* (citation omitted). An ALJ's failure to apply the correct legal standards is grounds for reversal. *See id.*

## II.    Eligibility for Disability Benefits

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005). An individual shall be determined to be under a disability only if his physical or mental impairment is of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see, e.g.*, *Butts*, 388 F.3d at 383.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The regulations of the Social Security Administration require a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

15

[2] If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. *See* 20 C.F.R. 404.1520. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. This assessment must be based on all relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1520(e).

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998).

## DISCUSSION

### I.   ALJ Cohen's Decision

ALJ Cohen engaged in the five-step process for making disability determinations. At the first step, ALJ Cohen found that plaintiff had not engaged in substantial gainful activity since the time of her alleged onset date of November 7, 2012. (Tr. 24.) At step two, he found that

plaintiff was severely impaired by the following ailments:  chronic headaches, obesity, asthma, and fibroid tumors with anemia.  (*Id.*)  He also noted that while plaintiff complained of right elbow pain, hypertension, and anxiety, those impairments did not significantly limit her ability to perform basic work activities.  (*Id.*)  At step three, ALJ Cohen found that these impairments did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1 of the regulations, citing the medical expert's testimony.  (Tr. 26.)

ALJ Cohen then assessed plaintiff's residual functional capacity ("RFC") at step four, concluding that plaintiff was unable to perform any past relevant work.  (Tr. 38.)  He noted that plaintiff could lift/carry and push/pull ten pounds occasionally, sit six hours per day, and stand or walk a combination of two hours per day.  (Tr. at 26.)  While he found that plaintiff could occasionally squat, crawl, stoop, kneel, crouch and balance, and could occasionally climb stairs or ramps, he acknowledged that she could never climb ladders or scaffolds, or be exposed to dust and fumes.  (*Id.*)

While ALJ Cohen found that plaintiff could not perform her past relevant work, he determined that she had the RFC to perform sedentary work as defined in 20 CFR 404.1567 and 416.967(a).  (*Id.*)  Thus, at step five, ALJ Cohen stated that there are a significant number of jobs in the national economy plaintiff could perform within the range of "sedentary work," as defined in 20 C.F.R. §§ 404.1567(a).  (Tr. 38–39.)  In particular, he relied on the testimony of vocational expert Pasculli to conclude that plaintiff could perform the requirements of a receptionist, an addresser, and a telephone solicitor.  (Tr. 39.)  Accordingly, considering all of the evidence, ALJ concluded that plaintiff was not disabled.  (*Id.*)

Overall, ALJ Cohen found that plaintiff's complaints were "subjective and not substantiated by the record," and that her "statements concerning the intensity, persistence and

17

limiting effect of [her] symptoms" were "not entirely consistent with the medical evidence and

other evidence . . . ." (Tr. 37.) ALJ Cohen questioned the severity of plaintiff's headaches,

stating that he would expect more emergency room or hospital records, or "more extensive and

significant treatment." (Tr. 37.) He found that Dr. Yakutilov's opinion was based on plaintiff's

self-reporting and "not supported by the record," affording it "limited weight." (*Id.*) In

particular, he discredited Dr. Yakutilov's conclusion that plaintiff was significantly limited in

reaching, handling, and fingering, pointing to the absence of evidence in the record regarding

plaintiff's reaching or manipulative limitations. (*Id.*) ALJ Cohen also stated that "the objective

evidence in the record" did not support the conclusions of Drs. Yakutilov, Ramirez Agramonte,

and Tawadrous that plaintiff's headaches were severe enough to frequently interfere with her

attention and concentration, and that she would be absent from work more than three days per

month. (*Id.*) Additionally, ALJ Cohen challenged the absence of a neuropsychological

examination, noting that, as the medical expert testified, "if there were such significant [memory]

problems," an examination would have been conducted. (*Id.*) Accordingly, ALJ Cohen found

plaintiff not disabled for purposes of the SSA and deemed her ineligible for benefits. (Tr. 39.)

## II.    Plaintiff's Challenge to the ALJ's Decision

Plaintiff appeals the ultimate finding of ALJ Cohen that she was not under a disability, as

defined in the SSA, from November 7, 2012, through the date of ALJ Cohen's decision. Plaintiff

argues for this Court's reversal of the decision of the Commissioner on two grounds. First, she

asserts that ALJ Cohen did not properly apply the treating physician's rule, as he assigned

insufficient weight to the treating physicians' finding that plaintiff's impairments would cause

her to be absent from work several days each month. (Pl.'s Mot. (Doc. No. 18) at 9.)

Additionally, plaintiff argues that the ALJ relied upon invalid vocational witness testimony,

insofar as the hypothetical posed to Pasculli was incomplete and failed to assume that the hypothetical individual had impaired attention and concentration, among other things. (*Id.* at 12–13.) The Commissioner, on the other hand, argues that the ALJ properly found that plaintiff was not disabled, and that he provided adequate reasons for assigning limited weight to the treating physicians' findings regarding plaintiff's absences from work.

### A. Treating Physician Rule

Under the "treating physician rule," ALJs are required to accord significant weight to certain opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(c)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("The law gives special evidentiary weight to the opinion of the treating physician."). "Treating source" is defined as a claimant's own "acceptable medical source" who has provided her "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1527(a)(2). "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Shaw*, 221 F.3d at 134.

In contrast to the opinions of treating physicians, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (citation omitted). While consultative examinations may constitute substantial evidence in some circumstances, *see Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order), they are "often brief, are generally performed without benefit or review

19

of the claimant's medical history and, at best, only give a glimpse of the claimant on a single

day." *Crespo v. Apfel*, No. 97-CV-4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17,

1999) (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)); *see also Gatien v. Berryhill*, No.

15-CV-4739 (ADS), 2017 WL 6397734, at *5 (E.D.N.Y. Dec. 13, 2017).

     Along the same lines, it is well-established that ALJs may not credit the opinion of a non-

examining medical expert over that of the treating source "unless it is supported by sufficient

medical evidence in the record." *Fontanez v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL

4334127fbur, at *19 (E.D.N.Y. Sept. 28, 2017) (internal quotation marks omitted) (citations

omitted); *see also Burgess*, 537 F.3d at 129–30 (remanding where the ALJ failed to provide

adequate reasons for adopting the non-examining expert's findings, which contradicted objective

evidence, over those of the treating physician).  Courts have held that ALJs "clearly erred" where

they "exclusively relied on [an expert's] testimony, despite the fact that [he] had never

examined" the plaintiff.  *Bradley v. Colvin*, 110 F. Supp. 3d 429, 443–44 (E.D.N.Y. 2015); *see

also Murphy v. Saul*, No. 17-CV-1757 (PKC), 2019 WL 4752343, at *4 (E.D.N.Y. Sept. 30,

2019) ("[A medical adviser's] assessment of what other doctors find is hardly a basis for

competent evaluation without a personal examination of the claimant." (internal quotation marks

omitted) (citations omitted)); *Fernandez v. Astrue*, No. 11-CV -3896 (DLI), 2013 WL 1291284,

at *16 (E.D.N.Y. Mar. 28, 2013) (finding that the ALJ committed error by giving "significant

weight to two non-examining sources and little weight to every examining source, nearly all of

whom were specialists in their fields").

     Where an ALJ does not afford a treating physician's opinion controlling weight, "he must

provide 'good reasons' for declining to do so, as well as 'good reasons' for according those

opinions whatever weight he assigns to them." *Castillo v. Colvin*, No. 13-CV-5089 (AT)

(MHD), 2015 WL 153412, at *20 (S.D.N.Y. Jan. 12, 2015) (quoting *Clark*, 143 F.3d at 118).

The ALJ must consider the following factors in determining the weight to be given to such

opinions: (1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship; (3) the evidence that supports the treating

physician's report; (4) how consistent the treating physician's opinion is with the record as a

whole; (5) the specialization of the physician compared to the condition being treated; and (6)

any other factors which may be significant. *See* 20 C.F.R. § 404.1527(c)(2)–(6); *see also*

*Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134.  Where an ALJ has not considered these

factors, remand may be appropriate. *See Burgess*, 537 F.3d at 129; *see also Halloran*, 362 F.3d

at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons'

for the weight given to a treating physicians[']s opinion and we will continue remanding when

we encounter opinions from ALJ[s] that do not comprehensively set forth reasons for the weight

assigned to a treating physician's opinion."); *Sanchez v. Colvin*, No. 13-CV-929 (MKB), 2014

WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014).

Moreover, the ALJ has a duty to explain his analysis and conclusions.  When a treating

physician provides a favorable report, the claimant "is entitled to an express recognition from the

[ALJ] of the existence of [the treating physician's] favorable . . . report and, if the [ALJ] does not

credit the findings of that report, to an explanation of why it does not."  *Snell v. Apfel*, 177 F.3d

128, 134 (2d Cir. 1999); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("We of

course do not suggest that every conflict in a record be reconciled by the ALJ . . . but we do

believe that the crucial factors in any determination must be set forth with sufficient specificity

to enable [reviewing courts] to decide whether the determination is supported by substantial

evidence." (citations omitted)); *Polidoro v. Apfel*, No. 98-CV-2071 (RPP), 1999 WL 203350, at

*7 (S.D.N.Y. Apr. 12, 1999) ("The ALJ's failure to . . . set forth the reasons for his conclusions with sufficient specificity hinders the ability of a reviewing court to decide whether his determination is supported by substantial evidence." (citation omitted)).

Furthermore, in applying the treating physician's rule, ALJs are obligated to develop the relevant record.  Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial."  *Butts*, 388 F.3d at 386 (internal quotation marks omitted) (citation omitted).  Thus, the "social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (brackets omitted) (internal quotation marks omitted) (citation omitted); *see also Butts*, 388 F.3d at 386. This duty exists even where, as here, the claimant is represented by counsel.  *See Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."  *Butts*, 388 F.3d at 386 (internal quotation marks omitted) (citation omitted); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(b), 416.912.

Here, ALJ Cohen assigned little weight to the opinions of plaintiff's treating physicians, who indicated that plaintiff would be absent from work at least three days per month due to her impairments.  (*See* Tr. 2063–64 (Dr. Yakutilov); 2093–94 (Dr. Tawadrous); 2152–57, 2183 (Dr. Ramirez Agramonte).)  ALJ Cohen also discredited Dr. Bederson's finding that plaintiff experienced memory problems, assigning his opinion "limited weight," and deferring instead to the psychiatric consultative examiner, Dr. Lancer, who found plaintiff's memory intact after a single visit.  (Tr. 37.)  Further, the ALJ gave little weight to the treating physicians' opinions

22

regarding plaintiff's mental condition, as they all indicated that her ability to perform work-related mental activities would be limited when she was experiencing headaches. ALJ Cohen's explanations for assigning little if any weight to the findings of plaintiff's treating physicians were somewhat cursory and appear to be influenced by the fact that he questioned plaintiff's credibility. Immediately prior to assigning limited weight to the treating sources, the ALJ stated that the "claimant's complaints are largely subjective and not substantiated by the record." (*Id.*) He then assigned "limited weight" to the opinion of Dr. Yakutilov, stating summarily that it was "not supported by the record." (*Id.*) In addressing the findings of Drs. Tawarous and Ramirez Agramonte, he again stated summarily that "the objective evidence in the record does not support" their assertions and afforded them "limited weight." (*Id.*)

By contrast, ALJ Cohen did assign significant weight to the opinions of Dr. Steven Goldstein, who did not examine plaintiff. ALJ Cohen found that Dr. Goldstein's opinion was "well-reasoned and well supported by the evidence in the record." (Tr. 38.) Given that ALJ Cohen assigned little weight to the findings of the treating physicians – specialists who personally examined plaintiff – it is unclear how ALJ Cohen believed that Dr. Goldstein's opinion was "well supported by the evidence in the record." (Tr. 38.) While an ALJ is entitled to rely on opinions of both examining and non-examining medical consultants, he must sufficiently explain why he discredits the opinions of the treating physicians in favor of an expert.

The ALJ further adopted Dr. Goldstein's opinion that additional documentation, such as physical examinations or hospital records, were required in order to conclude that plaintiff's impairment was sufficiently severe to qualify for benefits. (Tr. 74.) ALJ Cohen observed that there was no neuropsychological examination performed, and he opined that if plaintiff's

headaches were so severe, the record would include emergency room records, other hospital records, or more extensive and significant treatment. In contrast to several of plaintiff's treating physicians, he concluded: "[T]he claimant's treatment has not been so extensive, or significant to indicate that she would be absent from work more than three days per month." (Tr. 37.)

It is difficult to credit ALJ Cohen's finding that plaintiff's treatment was not extensive or significant. The exhibit file in this case contains over 1,750 pages of medical records. Those records document a lengthy hospital admission in which plaintiff underwent two separate brain surgeries, multiple angiogram procedures, at least two CT Scans of the head, and an abnormal EEG demonstrating seizure activity. The weight of the evidence is consistent with the opinions of the treating sources, which support plaintiff's testimony. Plaintiff has consistently complained of chronic headaches, as well as pain and numbness primarily on the right side of her head. Consultative examiner Dr. Joseph noted that there was tenderness on her right skull near the site of her shunt. (Tr. 891–94.) More importantly, there is objective clinical evidence supporting plaintiff's testimony. An EEG analyzed by Dr. Yakutilov in February 2014 showed that plaintiff was suffering from "sharp wave activity" in her right temporal lobe, which is in fact the precise place she complains of pain and numbness. (Tr. 2056.) Plaintiff's treating neurologists noted this as possible "underlying seizure" activity. (*Id.*)

It is notable that in making his findings, ALJ Cohen failed to address several key pieces of objective medical evidence. He made no mention of the EEG showing abnormal wave activity in the area in which plaintiff complains of pain, or many objective imaging studies. Given that the objective evidence is highly supportive of plaintiff's testimony and the findings of her treating physicians, it was clear error for ALJ Cohen to have ignored it. It is improper for an ALJ to "cherry-pick" which portions of the record to cite, and to ignore those portions which do

24

not support his decision. *See Pluck v. Astrue*, No. 10-CV-02042 (JG), 2011 WL 917654, at *19 (E.D.N.Y. Mar. 9, 2011).

ALJ Cohen did not mention the treating physician's rule, nor did he consider many of the factors that the SSA and its regulations require under 20 C.F.R. § 404.1527(c)(2)–(6). Instead, he summarily dismissed the treating physicians' opinions as unsupported by the record and ignored those portions of the record which supported them. "This legal error is sufficient basis for remand." *Gallagher v. Astrue*, No. 10-CV-8338 (LTS) (AJP), 2012 WL 987505, at *20 (S.D.N.Y. Mar. 22, 2012) (collecting cases), *report and recommendation adopted*, No. 10-CV-8338 (LTS) (AJP), 2012 WL 1339357 (S.D.N.Y. Apr. 17, 2012); *see also Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (ALJ committed legal error by failing to "consider all of the factors cited in the regulations."); *Ricks v. Astrue*, No. 10-CV-5236 (JS), 2012 WL 294415, at *8–9 (E.D.N.Y. 2012).

ALJ Cohen also relied on Dr. Goldstein's opinion that plaintiff could not have memory problems because there was no neuropsychological testing performed. Before ALJ Cohen could rely on Dr. Goldstein's statement, he was obligated to at least attempt to contact the treating physicians to question if there was a reason this test was not ordered. Although the regulations were amended to remove the provision requiring an ALJ to recontact a treating physician to resolve an ambiguity or obtain additional evidence,[6] the regulations still "contemplate the ALJ recontacting the treating physician when the additional information needed is directly related to that medical source's opinion." *Franco v. Berryhill*, No. 17-CV-7548 (ADS), 2019 WL 6211275, at *8 (E.D.N.Y. Nov. 21, 2019) (internal quotation marks omitted) (citation

---

[6] The current regulation offers the ALJ greater flexibility, providing that he may recontact a treating physician as one option for obtaining additional evidence. *See* 20 C.F.R. § 404.1520b(b)(2)(i) (2017) ("We may recontact your medical source."); *see also Ortiz v. Saul*, No. 18-CV-4516 (JLC), 2019 WL 4649516, at *24 n.20 (S.D.N.Y. Sept. 25, 2019).

omitted); *see also Gabrielsen v. Colvin*, No. 12-CV-5694 (KMK), 2015 WL 4597548, at \*6

(S.D.N.Y. July 30, 2015) (observing that courts in the Second Circuit have concluded that

despite the amended regulations, "the ALJ still has an obligation to re-

contact the treating physician in some cases" (citations omitted)); *Jimenez v. Astrue*, No. 12-CV-

3477 (GWG), 2013 WL 4400533, at \*11 (S.D.N.Y. Aug. 14, 2013).

As ALJ Cohen failed to accord sufficient weight to the findings of plaintiff's treating

physicians and failed to provide an adequate explanation for doing so, the case must be

remanded.

### B. Validity of the Vocational Expert's Testimony

Plaintiff also argues that the ALJ relied upon invalid vocational witness testimony by

Pasculli. Because the case is remanded based on the ALJ's failure to adhere to the treating

physician rule, the Court need not address this argument at length. Plaintiff's treating physicians

estimated that if she worked, she would be absent at least three days each month, and she would

need to lie down for one hour when she experienced a headache. Pasculli conceded that

someone who was absent from work three days per month would not be employable in the jobs

Pasculli identified for plaintiff. (Tr. 78.) Thus, the vocational expert's testimony implies that

plaintiff would not be employable regardless of whether her headaches were intractable, in

contrast to Dr. Goldstein's testimony. ALJ Cohen's reliance on Pasculli's testimony was

problematic and constitutes another potential ground for remand.

### CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is

DENIED, plaintiff's motion for judgment on the pleadings is GRANTED, and the matter is

remanded to the Commissioner of Social Security for further proceedings consistent with this

Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment

accordingly, and to close this case.

SO ORDERED.

Dated: Brooklyn, New York                    s/Roslynn R. Mauskopf
       Dec 22      , 2019
                                             _____
                                             ROSLYNN R. MAUSKOPF
                                             United States District Judge

27